**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

MASSACHUSETTS TEACHERS ASSOCIATION; BROOKLINE EDUCATORS UNION; KIRSTEN FRAZIER; KYLE GEKOPI

*Plaintiffs*,

v.

WILLIAM C. CAMPBELL, in his official capacity as Director of the Massachusetts Office of Campaign and Political Finance; ANDREA J. CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts,

*Defendants*.

**Case No.**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Massachusetts Teachers Association (MTA), Brookline Educators Union (BEU), Kirsten Frazier, and Kyle Gekopi, by and through their attorneys, bring this civil action for declaratory and injunctive relief and allege as follows:

## INTRODUCTION

1. In this action, Plaintiffs challenge the constitutionality of M.G.L. c. 55, § 13 (Section 13)'s categorical ban on all political solicitations by public employees (the Solicitation Ban, hereinafter also referred to as "the Ban"), as applied to such employees' solicitations of fellow union members for contributions to the political action committees (PACs) maintained by their unions. Section 13 broadly prohibits—indeed, *criminalizes*—all direct or indirect political

solicitations, including solicitations for union PACs, by public employees who work for any state, county, or municipal government entity. This restriction applies to solicitations made at any time, in any place, in any manner, and it subjects public employees who violate it to potential imprisonment, fines, and termination. Its restrictions are broader and more punitive than those found virtually anywhere else in the country, including under federal law, and result in the suppression of vast political advocacy and association to which the First Amendment has its "fullest and most urgent application." *Nat'l Republican Senatorial Comm. v. FEC*, 146 S. Ct. 2404, 2415 (2026) (cleaned up).

2. Plaintiffs MTA and BEU represent more than 106,000 educators employed by public school districts, colleges, and universities across Massachusetts. Each year, thousands of MTA and BEU members exercise their right to participate in the political process through their unions. As part of their political participation, many members contribute to their unions' PACs and would like to encourage their fellow union members to do the same. But the Solicitation Ban requires them to refrain from speech soliciting funds for their unions' PACs, even when they are off duty and away from school premises.

3. Plaintiffs Kirsten Frazier, an elementary and secondary school multilingual teacher, and Kyle Gekopi, a high school social studies teacher (together, the Educator Plaintiffs), are two such MTA members. They routinely engage in political advocacy and activism through their unions and wish to encourage their fellow union members to contribute to their unions' PACs to support pro-public education candidates for elected office. The Educator Plaintiffs would do so by explaining in member-to-member conversations, communications made in their roles as union leaders, and other forums why members should contribute to their unions' PACs, the ways in which the Educator Plaintiffs believe the PACs empower educators and other pro-public education

candidates to run for office, and how members can donate. But the Solicitation Ban's threat of criminal and civil penalties requires Mx. Frazier and Mr. Gekopi to either self-censor such speech or risk steep consequences for violating the Ban. Faced with this choice, Mx. Frazier and Mr. Gekopi avoid their desired speech to solicit PAC contributions, even at union events held over the summer and out of state.

4. The Solicitation Ban similarly chills the speech of countless other MTA and BEU members who would undertake member-to-member solicitations for their unions' PACs but for their fear of prosecution, fines, and loss of employment.

5. Political solicitations between members, as a form of political speech and association, are at the heart of MTA and BEU members' First Amendment rights to participate in our democratic process and to "engage in association for the advancement of beliefs and ideas." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958). While the government has some authority to regulate public employees' speech, the Solicitation Ban's blanket application to public employees' off-duty, off-site, member-to-member union PAC solicitations sweeps far too broadly. This substantial infringement of the Educator Plaintiffs' and other MTA and BEU members' core rights of political speech and association far outweighs any potential threat to government interests. Even if it did not, the Solicitation Ban's categorical prohibition, with no exceptions based on the time, place, or manner of the solicitation, restricts far more speech and association than is reasonably necessary to alleviate any such threat.

6. Plaintiffs therefore ask this Court to declare the Solicitation Ban, as applied to off-duty, off-site, member-to-member union PAC solicitations by MTA and BEU members (including the Educator Plaintiffs), unconstitutional under the First and Fourteenth Amendments and to enjoin its enforcement against such solicitations.

## JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343, as this action seeks to enforce constitutional rights under 42 U.S.C. § 1983 and the First and Fourteenth Amendments of the U.S. Constitution.

8. This Court has authority to grant the requested declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2201, and 2202; Federal Rules of Civil Procedure 57 and 65; and the general legal and equitable powers of the Court.

9. Venue is proper in the District of Massachusetts under 28 U.S.C. § 1391(b)(1) and (2) because all Defendants reside in this District and a substantial part of the acts or omissions giving rise to this action occurred and continue to occur within the District of Massachusetts.

## PARTIES

10. Plaintiff Massachusetts Teachers Association is a nonprofit and labor organization incorporated under Massachusetts law and headquartered in Quincy, Massachusetts. Founded in 1845, MTA has advocated for the Commonwealth's public schools, students, and educators for more than 180 years. MTA represents approximately 117,000 members across 400 affiliated local unions throughout Massachusetts. Its members include teachers, faculty, professional staff, and education support professionals working in public schools, colleges, and universities statewide. More than 106,000 MTA members—approximately 90% of MTA's total membership—are employees of a state, county, or municipal government entity.

11. MTA's mission is to advance educators' professional and economic interests while championing human and civil rights and advocating for high-quality public education in an environment where lifelong learning and innovation thrives. To further these aims in the political arena, MTA maintains the Voice of Teachers for Education (VOTE), a state PAC organized under

M.G.L. c. 55, § 5 to collect voluntary contributions from MTA members and use those contributions for purposes that include providing direct financial support to, and making expenditures on behalf of, pro-public education and pro-labor candidates for state and local office. MTA's local affiliates also may establish PACs to support municipal candidates, subject to state and local laws and regulations.

12. MTA is a state affiliate of the National Education Association (NEA), the nation's largest labor and professional organization that represents approximately three million members across the country who work at every level of education. MTA and NEA have unified membership, meaning that when an individual elects to become a member of MTA, they also become a member of NEA. NEA operates a federal PAC, the NEA Fund for Children and Public Education (NEA Fund), that pools voluntary contributions from NEA members, staff, and their families to support pro-public education candidates for federal and state elected office. All MTA members, as NEA members, may contribute to and be solicited for contributions to the NEA Fund. *See* 52 U.S.C. §§ 30118(b)(2)(C), 30119(b); 11 C.F.R. § 114.5(g)(2).

13. MTA brings this action on behalf of itself, as the Solicitation Ban imposes onerous burdens on its ability to engage in PAC fundraising and requires MTA to divert significant resources to ensure compliance with the Ban, and on behalf of its members, whose speech and associational rights are substantially infringed by the Solicitation Ban's application to member-to-member union PAC solicitations. These rights are central to MTA's purposes of advancing educators' professional and economic interests and advocating for high-quality public education, goals that MTA pursues through member-driven political activities. The participation of individual MTA members is not necessary to resolve MTA's claims that the Solicitation Ban, as applied to member-to-member union PAC solicitations, violates the First and Fourteenth Amendments.

14. Plaintiff Brookline Educators Union is a nonprofit and labor organization incorporated under Massachusetts law and located in Brookline, Massachusetts. BEU represents approximately 1,150 members who are employed by the Public Schools of Brookline as classroom teachers; direct student service providers like social workers, school psychologists, and speech therapists; paraprofessionals; and school administrators. BEU is a local affiliate of MTA and NEA, and BEU, MTA, and NEA have unified membership.

15. BEU's mission is to ensure that every student in Brookline receives a high-quality public education through the collective power, wisdom, and solidarity of educators standing together. BEU seeks to further these goals by promoting union democracy, collaborating with community and town partners on priorities like supporting Brookline's immigrant community, and building BEU's electoral relevancy in municipal races. To that end, just last year, it launched a member-run candidate endorsement committee to interview candidates for the Brookline School Committee and make recommendations for BEU endorsement.

16. BEU brings this action on behalf of itself, as the Solicitation Ban imposes onerous burdens on its ability to engage in PAC fundraising and requires BEU to divert significant resources to ensure compliance with the Ban, and on behalf of its members, whose speech and associational rights are substantially infringed by the Solicitation Ban's application to member-to-member union PAC solicitations. These rights are central to BEU's mission of drawing on the collective power of educators to promote high-quality public education in Brookline, an aim that BEU pursues in part through members' political engagement. The participation of individual BEU members is not necessary to resolve BEU's claims that the Solicitation Ban, as applied to member-to-member union PAC solicitations, violates the First and Fourteenth Amendments.

17. Plaintiff Kirsten Frazier has been a multilingual teacher in the Worcester Public Schools since 2022 and a public educator in Massachusetts since 2015. They are an active member of MTA, NEA, and the Educational Association of Worcester (EAW), a local affiliate of MTA and NEA. Mx. Frazier is a member of EAW's Legislative Committee (which vets and recommends candidates for the Worcester School Committee and other local offices for EAW endorsement), a summer member organizer, and an MTA Political Action Liaison. They have served as an elected member of MTA's Executive Committee, Board of Directors, and LGBTQ+ Committee and are a regional Co-Director of the NEA LGBTQ+ Caucus.

18. Plaintiff Kyle Gekopi is a high school social studies teacher employed by the Wellesley Public Schools, where he has worked since August 2009. He joined the Wellesley Educators Association (WEA), a local affiliate of MTA and NEA, during his first day on the job and is an active member of WEA, MTA, and NEA. Mr. Gekopi has held various leadership positions within WEA since 2010 and is currently its Fiduciary Co-President. He also served on MTA's Board of Directors from 2022–2025 and was a member of NEA's Board of Directors from 2024–2025. Mr. Gekopi's commitment to public service extends to his home community; he was appointed to a vacant seat on the Norwood Town Meeting in 2025 and, in April 2026, was elected to a three-year term as Town Meeting Representative. Even though he is an elected official, Mr. Gekopi remains subject to the Solicitation Ban because of his status as a compensated public employee. *See* Off. of Campaign & Pol. Fin. (OCPF), GL-95-32, Guidance Letter on Solicitation by Compensated Public Employee 1 (Dec. 15, 1995); OCPF, Advisory Opinion AO-82-10, at 2 (Aug. 27, 1982).

19. Defendant William C. Campbell is the Director of the Office of Campaign and Political Finance (OCPF), the state agency that administers M.G.L. c. 55, and has authority to

investigate and determine civil penalties for violations of Section 13. M.G.L. c. 55, §§ 3, 13; 970 C.M.R. § 3.07. He is sued in his official capacity only.

20. Defendant Andrea J. Campbell is the Attorney General of the Commonwealth of Massachusetts and has authority to prosecute and seek criminal penalties for violations of Section 13. M.G.L. c. 55, § 13; 970 C.M.R. § 3.07(2). She is sued in her official capacity only.

21. At all times relevant to Plaintiffs' claims, Defendants act under color of state law in administering and enforcing Section 13 in their official capacities.

## FACTUAL ALLEGATIONS

### I. Section 13's Solicitation Ban Categorically Prohibits and Criminalizes All Solicitations of Union PAC Contributions by Active MTA Members.

22. M.G.L. c. 55, § 13 (Section 13) provides in relevant part that:

> No person employed for compensation, other than an elected officer, by the commonwealth or any county, city or town shall directly or indirectly solicit or receive any gift, payment, contribution, assessment, subscription or promise of money or other thing of value for the political campaign purposes of any candidate for public office or of any political committee, or for any political purpose whatever[.]

Violations of this sweeping ban "shall be punished by imprisonment for not more than one year or by a fine of not more than one thousand dollars." *Id.* In addition, a public employee "convicted of violating" Section 13 "may be removed by the appointing authority without a hearing." *Id.*

23. Together, these provisions of Section 13 create a blanket Solicitation Ban that not only categorically prohibits but also criminalizes virtually all speech and expression by non-elected public employees to solicit political contributions.

24. OCPF—the independent state agency that interprets and enforces M.G.L. c. 55, *see id.* § 3—treats the Solicitation Ban as a global prohibition on "any activity which indicates support, in a material way, for the fundraising efforts of a candidate or political committee or for any other political purpose." *Public Employee Involvement in Political Activity*, OCPF, Advisory Opinion

AO-93-11, at 2 (May 4, 1993). The Ban thus "applies at all times, including after the employee's regular work hours and on weekends and vacations," OCPF, IB-92-01, Interpretive Bulletin on the Application of the Campaign Finance Law to Political Fundraising by Public Employees 3 (iss. June 1992, rev. July 12, 2017), and is "not confined to any geographical limits," *Political Fundraising by Public Employees*, OCPF, Advisory Opinion AO-02-29, at 1 (June 28, 2002).

25. Among the many forms of political speech it impedes, the Solicitation Ban categorically prohibits public employees from directly or indirectly soliciting contributions for PACs organized by their unions under virtually any circumstances and in any manner. OCPF guidance emphasizes that the Ban applies to union PAC solicitations regardless of whether the solicitation takes place during working hours, on the public employer's premises, or involves the use of public resources. In its advisory opinions, OCPF has determined that:

- Although public employees may speak about their unions' PACs with fellow employees, they cannot urge fellow employees to make a one-time or regular contribution in any form, directly or indirectly, even by providing a PAC membership application when requested by a co-worker. *Methods of Increasing PAC Membership and Expanding PAC Membership Benefits*, OCPF, Advisory Opinion AO-97-07, at 3 (Mar. 4, 1997).

- Public employees cannot speak at any meeting, "regardless of its location," intended to solicit union PAC contributions. *Id.*

- Public employees may not participate as a "featured speaker" or panelist at a fundraising event or any other forum sponsored by an organization, if the employee knows or has reason to know that their participation will be used for political fundraising purposes or as a "draw" to future or continued membership in an organization whose dues are used in part or in full for political purposes. *Public Employees and Political Solicitation*, OCPF, Advisory Opinion AO-91-25, at 4–5 (Nov. 25, 1991); *Political Endorsements by Public Employees*, OCPF, Advisory Opinion AO-90-04, at 1 (Feb. 2, 1990).

- A union PAC's solicitation letters and emails cannot be signed by a public employee or otherwise include a public employee's name in a letterhead or elsewhere, even if that employee is a union or PAC officer. AO-97-07, *supra*, at 4.

- While public-employee union PACs, like all other PACs, may "accept contributions" by payroll deduction upon receipt of a signed authorization card from the contributor and the employer's agreement, M.G.L. c. 55, § 9A; *see Public Employees' Contributions to a PAC Through a Signed Authorization for the Deduction of a Portion of Union Dues*, OCPF,

Advisory Opinion AO-09-06 (Apr. 17, 2009); M.G.L. c. 150E, § 7(d)(b1/2), public employees cannot distribute or personally collect authorization cards for their union PACs from their fellow employees at any time, even when off-duty, and in any place, even outside of the workplace or state, *MA Correction Officers Federated Union PAC*, OCPF, Advisory Opinion AO-15-04, at 2–3 (Dec. 28, 2015).

26. There exists only one narrow exception to the Solicitation Ban's coverage: A public employee who takes an unpaid leave of absence of at least six months, without receiving any benefits subsidized by the public employer, is not subject to the Ban for the duration of the leave. OCPF, GL-14-05, Guidance Letter on Union Compensation During a Public Employee's Leave of Absence 2 (Sep. 25, 2014); *Political Fundraising by Public Employees on Leave of Absence*, OCPF, Advisory Opinion AO-13-05, at 2–3 (June 13, 2013); IB-92-01, *supra*, at 3; OCPF, GL-15-05, Guidance Letter on Public Employee Fundraising Restrictions 3 (Nov. 24, 2015). For public employees unable to forgo compensation and benefits for at least half a year, the Solicitation Ban remains absolute.

27. Political solicitations are "characteristically intertwined with informative and perhaps persuasive speech," *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 442–43 (2015) (quoting *Riley v. Nat'l Fed'n of Blind of N.C., Inc.*, 487 U.S. 781, 798 (1988)), concerning "public issues and the qualifications of candidates for elected office," *id.* at 443. Such solicitations are therefore both protected political speech and speech on matters of public concern.

28. "Effective advocacy" is also "undeniably enhanced by group association" consisting of speech between and among members of a voluntary association. *Patterson*, 357 U.S. at 460. As a result, the Supreme Court has deemed "freedom to engage in association for the advancement of beliefs and ideas" to be an "inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment." *Id.*

29. The Solicitation Ban imposes censorship that is "vast in its reach." *Citizens United v. FEC*, 558 U.S. 310, 354 (2010). Its restrictions threaten approximately 433,300 state and local

government employees—nearly one out of every 13 adult residents of the Commonwealth—with imprisonment, fines, and termination from public employment should they engage in any speech with other members that might be construed as a direct or indirect political solicitation.[1] MTA and BEU's 106,000 active public-employee members—or one out of every 53 adult Bay Staters—are nearly a fourth of the public employees whose speech is so chilled. The Ban's prohibitions and penalties apply with full force to these members' solicitations for their unions' PACs at any time, in any place, and under any circumstance. And the Ban does not differentiate between solicitations of subordinate employees and solicitations of non-subordinate employees or even fellow union members who work for a different Massachusetts public employer or in another state.

30. In contrast, the Hatch Act allows federal employees to solicit contributions to PACs maintained by their unions from any "member of the same Federal labor organization" who is "not a subordinate employee," as long as the soliciting employee is not on duty, on federal property, "wearing a uniform or official insignia identifying the office or position of the employee," or otherwise using federal resources at the time of the solicitation. 5 U.S.C. §§ 7323(a)(2), 7324(a).

31. Likewise, the overwhelming majority of states permit employees of state and local government entities to solicit political contributions subject to certain restrictions, for example, on solicitations during work hours, on government property, using public resources, or from subordinate employees. Public employees in these states generally may solicit contributions for their union PACs provided they comply with any applicable limitations.[2]

---

[1] *See All Employees: Government: Local Government in Massachusetts* [SMS25000009093000001], FRED, Fed. Rsrv. Bank of St. Louis (Sep. 18, 2026, at 10:48 ET), https://fred.stlouisfed.org/series/SMS25000009093000001; *All Employees: Government: State Government in Massachusetts* [SMS25000009092000001], FRED, Fed. Rsrv. Bank of St. Louis (Sep. 18, 2026, at 10:51 ET), https://fred.stlouisfed.org/series/SMS25000009092000001; *Citizen Voting Age by Race and Ethnicity 2020-2024,* U.S. Census Bureau (Jan. 30, 2026), https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap/2020-2024-CVAP.html.

[2] *See*, *e.g.*, Ariz. Rev. Stat. Ann. § 41-752 (public employees may "[s]olicit or encourage contributions" while off duty and not in uniform, without using public resources); Fla. Stat. § 110.233 (employees may not take part in partisan activity while on duty and shall not "use any promise of reward or threat of loss to encourage or coerce any employee

## II. The Solicitation Ban Silences MTA and BEU Members Who Wish to Solicit Contributions to Their Unions' PACs.

32. Thousands of MTA and BEU members exercise their right to participate in the political process through their unions. Their participation takes various forms, from joining canvassing or phone and text-banking events coordinated by MTA and its local affiliates to holding union leadership positions in which they organize other members in support of political candidates and causes. Through these channels and in informal conversations, MTA and BEU members routinely discuss political candidates and questions with each other and encourage their fellow members to get involved in their unions' political activities.

33. In today's political ecosystem, "[a]ll speakers . . . use money amassed from the economic marketplace to fund their speech," *Citizens United*, 558 U.S. at 351, and the funds available to a particular political speaker decide "the number of issues discussed, the depth of their exploration, and the size of the audience reached," *Buckley v. Valeo*, 424 U.S. 1, 19 (1976) (per curiam). Consequently, PACs "play an increasingly dominant role in politics: by pooling funds and voices, they present an opportunity for individuals to participate effectively in the political process." *Lodge No. 5 of Fraternal Order of Police ex rel. McNesby v. City of Philadelphia*, 763 F.3d 358, 368 (3d Cir. 2014).

34. For many MTA and BEU members, including Mx. Frazier, contributing to their unions' PACs is an important facet of their political participation and association with fellow members. Through the PACs, members pool their financial resources in order to express their support for pro-public education candidates and thus to amplify the reach of pro-public education

---

to support or contribute to any political issue, candidate, or party"); Conn. Gen. Stat. § 5-266a (employees in classified state service may not use authority or influence to interfere with elections and may not "coerce, attempt to coerce, command or advise a state or local officer or employee" to make political contributions, but otherwise "shall be free to participate actively in political management and campaigns").

views in political discourse. Members like the Educator Plaintiffs place an especially high value on their union PACs' support for candidates who are themselves public educators because the Solicitation Ban prevents these candidates from fundraising for their own campaigns, *see, e.g.*, GL-15-05, *supra*, at 2, and thus creates an obstacle they must overcome to enter the electoral fray. In these members' view, their unions' PACs, as an alternative source of potential funding, mitigate this challenge for educators and other public-employee candidates who might be deterred from seeking office by their inability to fundraise.

35. As part of their engagement in the political process and commitment to supporting pro-public education candidates, MTA and BEU members, including the Educator Plaintiffs, wish to solicit contributions to their unions' PACs—the NEA Fund, VOTE, and as applicable, local affiliate PACs—from their fellow members. But, as the examples below demonstrate, facing the risk of criminal and civil penalties and loss of livelihood should they violate the Solicitation Ban, MTA and BEU members (including the Educator Plaintiffs) refrain from speech that might be construed as unlawfully soliciting union PAC contributions from their fellow union members.

36. If not for the Solicitation Ban, MTA and BEU members (including the Educator Plaintiffs) would solicit union PAC contributions from their fellow union members outside of working hours, away from public facilities, and without using public resources.

**A. The Solicitation Ban Forces the Educator Plaintiffs to Self-Censor in Their Roles as Union Leaders and in Informal Conversations with Fellow Members.**

37. Plaintiff Kirsten Frazier places a high value on their individual participation in state and local politics and routinely engages in political advocacy through EAW, MTA, and NEA. As a member of EAW's Legislative Committee, a summer member organizer, and an MTA Political Action Liaison, Mx. Frazier organizes EAW and MTA members to participate in legislative and political advocacy campaigns led by MTA, educates members on upcoming issues and candidates,

and shares calls for rapid political actions. In these union activities and in informal, one-on-one conversations, Mx. Frazier frequently encourages their fellow EAW and MTA members to get involved in the political process through their unions.

38. Mx. Frazier is a regular contributor to VOTE and the NEA Fund and views their PAC contributions as a way of expressing support for educators and other pro-public education candidates seeking office. Mx. Frazier's belief in the importance of their unions' PACs was strengthened by their 2025 run for Worcester City Council. While their campaign did not progress to the point of fundraising, the experience of planning campaign logistics highlighted for Mx. Frazier the practical challenges the Solicitation Ban presents for public-employee candidates. Mx. Frazier believes that growing their unions' PACs could reduce this barrier to entry for educators interested in seeking office by expanding access to another funding source. But the Solicitation Ban deters Mx. Frazier from sharing this view with union members or suggesting that they contribute to the union PACs.

39. If not for the Solicitation Ban, Mx. Frazier would encourage MTA and EAW members to contribute to their unions' PACs. They consider such requests a natural extension of their work as a Political Action Liaison and member organizer to encourage fellow members to participate in the political process. Mx. Frazier would also discuss the importance of member contributions to the PACs in their informal conversations with MTA and EAW members.

40. Like Mx. Frazier, Plaintiff Kyle Gekopi has a long track record of political advocacy through his unions. Among other leadership roles, Mr. Gekopi sits on MTA's Candidate Recommendation Committee, an elected group of members who vet candidates for statewide and federal office and make recommendations for endorsement by MTA. He also has been active in several MTA ballot initiative campaigns and, in his current position as WEA's Fiduciary Co-

President and in previous roles, has organized WEA members to participate in canvassing, signature collection, door knocking, and phone banking.

41. Mr. Gekopi believes that in the modern political ecosystem, union PACs are a pragmatic necessity to ensure that public employees have a meaningful voice in debates about issues that affect their working conditions, their students, and their daily lives. Consistent with this view, Mr. Gekopi would like to solicit contributions to his unions' PACs from WEA and MTA members. But because of the Solicitation Ban, he refrains from discussing how members can contribute to the PACs, the ways in which the PACs can support educators and other pro-public education candidates seeking office, or why he believes member PAC contributions matter.

42. If not for the Solicitation Ban, Mr. Gekopi would encourage other WEA and MTA members to contribute to their unions' PACs in his routine communications with WEA members as Fiduciary Co-President, in connection with events for new WEA members, and in one-on-one conversations with fellow members.

**B. The Solicitation Ban Chills Other MTA and BEU Members' Speech Related to Union PAC Solicitations.**

43. Other MTA and BEU members similarly self-censor speech that could be construed as directly or indirectly soliciting contributions to their unions' PACs because they fear prosecution and loss of employment under the Solicitation Ban. If they were allowed, these members, too, would solicit union PAC contributions from fellow union members, outside of working hours and without using public facilities or resources.

44. For example, BEU President Justin Brown, an elementary school teacher employed by the Public Schools of Brookline, is currently on full-time release from his classroom duties, but the Solicitation Ban still applies to him and restricts his political speech. As a result, Mr. Brown self-censors references to VOTE and NEA Fund when he speaks at BEU events and does not

advertise the PACs in routine member communications, even though he considers union PAC contributions an important form of political participation. If he were permitted, Mr. Brown would encourage BEU and MTA members to donate to their unions' PACs as a way of strengthening and elevating their collective voice, including through one-on-one conversations, requests in the BEU newsletter, and other membership-wide communications.

45. In his capacity as BEU President, Mr. Brown has spoken with other BEU members about the Solicitation Ban and sees firsthand how it leads members to censor their own political speech. Dave Knott is one such BEU member. Mr. Knott is a high school math teacher employed by the Public Schools of Brookline. He believes that political fundraising is crucial to public educators' equal and active participation in political discourse and elections. A founding member of BEU's candidate endorsement committee, Mr. Knott encourages members to support BEU-endorsed candidates for local office in one-on-one conversations. But because of the Solicitation Ban, he avoids any speech that might be construed as directly or indirectly soliciting contributions for the candidates and does not mention VOTE or the NEA Fund at all, much less highlight the possibility that VOTE might support BEU-endorsed candidates. If he were able, Mr. Knott would solicit funds for his unions' PACs in these conversations with fellow union members.

46. Likewise, Karen Shashoua—an elementary school teacher employed by the Public Schools of Brookline, a BEU member, and a Brookline resident—frequently discusses pro-public education candidates for the Brookline School Committee with other union members who live in Brookline and encourages these members to participate in town elections. An experienced local campaign volunteer, Ms. Shashoua knows that every dollar counts for candidates in tight municipal races, as expenses like mailers and lawn signs add up quickly. She is also aware that many candidates' resources are limited by their reliance on self-funding and that the Solicitation Ban

reduces public-employee candidates' access to resources still further. Because of the Ban, Ms. Shashoua does not ask fellow members to contribute either to campaigns or to their unions' PACs when speaking with them about local races. If she were able, Ms. Shashoua would solicit contributions for her unions' PACs in these conversations by explaining her belief that member donations help pro-public education candidates overcome the obstacle of self-funding.

### C. The Solicitation Ban Silences MTA and BEU Members Including the Educator Plaintiffs Across State Lines at NEA's Representative Assembly.

47. Because of the Solicitation Ban, MTA and BEU members including the Educator Plaintiffs also refrain from soliciting union PAC contributions at NEA's Representative Assembly (hereinafter referred to as "RA"). The RA is NEA's primary legislative and policymaking body and consists of nearly 7,000 educator delegates who represent state and local affiliates, student members, retired members, and other segments of the education profession. It convenes each July to adopt NEA's strategic plan and budget, resolutions, legislative program, and other policies.

48. Each year, MTA sends approximately 170 member-delegates to the RA, nearly all of whom are active public employees. Mr. Gekopi has attended the RA as a statewide or regional delegate for MTA every year since 2019, and Mx. Frazier has served as a regional delegate for MTA since 2024.

49. Even though the RA meets in a different city and state each year and has not been held in Massachusetts since 2017, the Solicitation Ban's threat of criminal and civil penalties follows the Educator Plaintiffs and other MTA member-delegates across state lines and deters them from speaking in support of their union PACs throughout this out-of-state union event.

50. Every morning during the five-day RA, delegates from each state convene to discuss the business of the day. At a designated time during these daily state caucus meetings, member-delegates solicit contributions to the NEA Fund. In doing so, they explain their reasons

for contributing, share their views about the NEA Fund's role in electing pro-labor, pro-public education candidates to federal office, and encourage other members to donate.

51. All active public employees in MTA's delegation are warned at every state caucus meeting that they must not solicit contributions during the designated time for PAC solicitations, because the Solicitation Ban prohibits delegates who are active public employees in Massachusetts from directly or indirectly encouraging their fellow union members to contribute to the NEA Fund. Accordingly, while active public employees in MTA's delegation may ask questions or state that they personally contribute to the PACs and explain how they do so, they cannot say anything that might be construed as soliciting PAC contributions. Unsure of where the Solicitation Ban draws the line between describing their own donations and encouraging other members to donate, many active public-employee delegates choose not to speak during this portion of the daily state caucus meetings out of fear of violating the law.

52. This directly harms the Educator Plaintiffs, both of whom intend to seek election as RA delegates again in 2027 and subsequent years. Because of the Solicitation Ban, the Educator Plaintiffs refrain from speaking during the daily PAC solicitations at the RA. Instead, at every RA they have attended, Mx. Frazier and Mr. Gekopi have sat in silence while retired MTA member-delegates (usually, fewer than 10 of MTA's approximately 170 delegates) or MTA staff explain to active public-employee member-delegates the importance of educators having a voice in the political process.

53. But for the Solicitation Ban, Mx. Frazier would solicit contributions to the NEA Fund during the daily state caucus meetings instead of being forced to censor their speech at a union event held during the summer break and outside of Massachusetts.

54. Likewise, if it were permitted, Mr. Gekopi would solicit PAC contributions during the daily state caucus meetings, by expressing his view that giving to the NEA Fund is part of union solidarity, as it allows members to pool their collective resources in support of pro-labor, pro-public education candidates in different parts of the country and encouraging MTA delegates to contribute.

55. The Solicitation Ban similarly chills the speech of other MTA and BEU member-delegates at the RA. For example, BEU President Justin Brown served as an RA delegate for the first time in 2026 and intends to seek a delegate position in 2027 and subsequent years. To avoid violating the Solicitation Ban, he too held his tongue every morning at the daily state caucus meeting while retired MTA delegates solicited contributions for the NEA Fund. If not for the Ban, Mr. Brown would have spoken about his belief in the power of member PAC contributions during these sessions and wishes to do so at future RAs.

**D. The Solicitation Ban's Application to Union PAC Solicitations Unduly Burdens MTA and BEU Members' Political Speech.**

56. As the above examples show, application of the Solicitation Ban to union PAC solicitations by MTA and BEU members, including the Educator Plaintiffs, from their fellow union members restricts their political speech and expressive activity in a manner that greatly outweighs any legitimate interest that the government may have in prohibiting such speech and expression.

57. As a result of the Solicitation Ban's application to their member-to-member solicitations of union PAC contributions, even when undertaken outside of working hours, without using public facilities or resources, and beyond state lines, MTA and BEU members including the Educator Plaintiffs have suffered and continue to suffer harm.

58. MTA and BEU members, including the Educator Plaintiffs, do not intend to solicit contributions to political campaigns, committees, or causes other than their unions' PACs.

59. MTA and BEU members, including the Educator Plaintiffs, do not intend to solicit union PAC contributions during work hours, in public buildings, using public resources, or relying on official titles.

60. MTA and BEU members, including the Educator Plaintiffs, do not intend to solicit union PAC contributions from non-union members or from public employees over whom they have supervisory authority.

61. On information and belief, the Solicitation Ban's application to such union PAC solicitations by MTA and BEU members, including the Educator Plaintiffs, does not prevent any actual and concrete harm to the operations of the government in any direct and material fashion.

62. MTA and BEU members, including the Educator Plaintiffs, have no adequate remedy at law for any of the above-described ongoing violations of their constitutional rights.

## III. The Solicitation Ban Impedes MTA and BEU's PAC Solicitations and Forces Them to Divert Resources.

63. In addition to harming MTA and BEU members, the Solicitation Ban, as applied to member-to-member union PAC solicitations, harms MTA and BEU in their own right.

### A. The Solicitation Ban Reduces MTA's Ability to Fundraise for VOTE and Imposes Steep Compliance Costs.

64. To further its mission of advancing educators' professional and economic interests while advocating for high-quality public education, MTA undertakes extensive political advocacy in support of pro-public education, pro-labor candidates and policies. In a typical election cycle, MTA endorses approximately 50 candidates, provides assistance to locals in around a dozen municipal candidate elections, and advocates for or against as many as four statewide ballot initiatives. The union organizes member canvassing, phone banking, text banking, and tabling events in support of these endorsed candidates and policies. Between election cycles, members

power MTA's legislative campaigns through union-organized voter education programs, media awareness drives, and coordinated outreach to state legislators.

65. MTA relies on outreach by members to members in order to promote these political actions. In its experience, personal outreach from a union leader or fellow member, such as one-on-one conversations or direct messages, generates a higher response rate and stronger engagement than similar outreach from non-member MTA staff. Member-to-member outreach by MTA leaders, local affiliate officers like Mr. Gekopi, or member-activists like Mx. Frazier is by far the most effective way to activate members, especially members who are new to MTA-organized political activities. These efforts yield results: MTA estimates that between 500 and 1,000 members participate in any given political action, with some drawing as many as 2,500 members.

66. In addition to its outreach, education, and endorsement activities, MTA provides financial support to its endorsed candidates through VOTE. By combining small-dollar member donations into larger donations to the candidates most in need of resources, VOTE amplifies the reach of MTA members' contributions and thus increases the impact of MTA's political advocacy.

67. The Solicitation Ban significantly hampers MTA's ability to raise contributions for VOTE. The Ban prohibits even MTA's top leadership—including its President and Vice President—from soliciting for VOTE. This means not just that MTA officers cannot directly ask members to give money, but also that they cannot sign fundraising emails or letters, give remarks at meetings or events intended to solicit contributions, or act as a "draw" to a fundraising event. These restrictions also apply to most other MTA leaders and active members.

68. As a result, MTA cannot employ the tried-and-true method of member-to-member outreach, which is so successful in turning members out to participate in other political activities, to solicit contributions for VOTE. Instead, it must rely on non-member staff or retired MTA

members—fewer than one-tenth of MTA's 117,000 members—to carry out all fundraising for VOTE.

69. Given the limited capacity of its staff and retired members, MTA must either divert staff from essential work, like assisting local affiliates in collective bargaining or supporting MTA's legislative or ballot initiative campaigns, to solicit VOTE contributions or limit its efforts to raise funds to the few measures within current staff and retiree capacity. Because it cannot shift staff away from other critical work for significant amounts of time, MTA has opted for the latter and solicits VOTE contributions primarily through in-person tabling by MTA staff at the union's Annual Meeting, conferences, and other events, generally on a quarterly basis. But these restricted solicitations reach only a fraction of MTA's membership and, unsurprisingly, generate a relatively small number of contributions to VOTE: in 2025, approximately 125 people contributed to the PAC, representing at most 0.1% of MTA's membership.

70. The Solicitation Ban similarly prevents MTA from successfully soliciting contributions for the NEA Fund, frustrating its mission of advocating for members' interests and pro-public education policies at the national level. In 2025, fewer than 100 Massachusetts residents—again, a vanishingly small percentage of MTA members—contributed to the NEA Fund.

71. Based on its experience recruiting thousands of members to participate in other political actions, MTA believes that, if permitted, member-to-member solicitations would prove the most effective method of soliciting PAC contributions and would substantially increase the number and amount of contributions made by MTA members to their unions' PACs.

72. By preventing MTA from organizing its leaders and members to solicit contributions, the Solicitation Ban directly reduces MTA's ability to raise PAC funds.

73. In addition, MTA diverts resources from other activities to ensure its own compliance with the Solicitation Ban, as well as the compliance of its local affiliates and members. MTA's Division of Legal Services devotes many hours each year to educating leaders and staff on the Ban and its proscriptions, providing advice on whether desired speech and expression might be construed as violating it, and consulting with OCPF. The Division receives and must respond to multiple questions about the Solicitation Ban each week, with the volume increasing even more during election seasons. MTA's field representatives, too, spend significant time coordinating with MTA staff and local leadership about member concerns related to the Solicitation Ban and working with affiliates on plans to launch and raise funds for local PACs without breaking the law, among other Ban-related activities.

**B. The Solicitation Ban Forces BEU to Refrain from Fundraising for VOTE and Devote Substantial Officer Time to Compliance.**

74. Like MTA, BEU sees political participation as key to achieving its mission of promoting high-quality public education through the collective power of educators. BEU strives to empower educators as actors in the democratic process through its political activities. To that end, the union provides opportunities for members to engage in municipal politics, such as its candidate endorsement committee and canvassing related to proposed property tax override measures to support Brookline's public schools. BEU also organizes members to participate in political campaigns and actions led by MTA, for example, canvassing and voter education programs linked to MTA's ballot initiative campaigns, and encourages members to support pro-public education, pro-labor candidates in their home communities.

75. Despite BEU's commitment to facilitating members' political participation and collective action, BEU does not encourage members to contribute to VOTE or NEA Fund as part of its political work. This is because the Solicitation Ban makes it effectively impossible for BEU

to do so. All BEU officers and members are employed by the Public Schools of Brookline, and BEU does not have any non-member staff who might solicit contributions without running afoul of the Ban. An MTA field representative is assigned to support BEU and could solicit PAC contributions on the union's behalf, but the representative works with multiple affiliates and must split their time between them. For BEU to request the representative's assistance with PAC solicitations would mean giving up valuable support for its organizing, collective bargaining, and contract enforcement activities. Faced with these constraints, BEU forgoes PAC solicitations altogether.

76. In addition, BEU diverts resources from other core activities to ensure members' compliance with the Solicitation Ban. As BEU's political activities have expanded in recent years, questions about the Solicitation Ban have arisen more frequently. BEU President Justin Brown has consulted and coordinated with MTA staff and local leadership about concerns related to the Solicitation Ban, done extensive research on the law and its implications for members, and communicated with members about the Solicitation Ban, including by providing resources and information. Mr. Brown estimates that he has spent at least 20 hours to date, and continues to spend several hours a week on matters related to the Solicitation Ban. This is time that Mr. Brown, who is on full-time release from his duties as a classroom teacher to support implementation of BEU's collective bargaining agreement with the district, would otherwise spend on bargaining, resolving grievances, and other core representational functions.

77. As a result of the Solicitation Ban's application to member-to-member solicitations of union PAC contributions, even outside of working hours, without using public facilities or resources, and beyond state lines, MTA and BEU have suffered and continue to suffer harm.

78. MTA and BEU have no adequate remedy at law for any of the above-described ongoing violations of their constitutional rights.

## CLAIMS FOR RELIEF

### COUNT I (42 U.S.C. § 1983)
### (Against All Defendants)
### Violation of the First and Fourteenth Amendments—Free Speech and Association

79. Plaintiffs reallege and incorporate by reference all of the allegations in paragraphs 1 through 78 as set forth herein.

80. The First Amendment to the U.S. Constitution, as applied to the states under the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech." This bedrock constitutional guarantee "has its fullest and most urgent application" to political speech. *Nat'l Republican Senatorial Comm.*, 146 S. Ct. at 2415 (cleaned up).

81. The First Amendment also protects "the right of individuals to associate to further" their beliefs. *Healy v. James*, 408 U.S. 169, 181 (1972). Indeed, the "practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process." *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 294 (1981). And the right of association "is diluted if it does not include the right to pool money through contributions, for funds are often essential if advocacy is to be truly or optimally effective." *Id.* at 296 (cleaned up).

82. The Solicitation Ban, as applied to member-to-member union PAC solicitations by MTA and BEU members including the Educator Plaintiffs, outside of working hours and without the use of any public facilities or resources, restrains and chills MTA and BEU members' protected political speech and association under threat of criminal and civil penalties.

83. The Solicitation Ban, as applied to member-to-member union PAC solicitations by MTA and BEU members including the Educator Plaintiffs, outside of working hours and without the use of any public facilities or resources, violates the First Amendment.

**COUNT II (42 U.S.C. § 1983)**
**(Against All Defendants)**
**Violation of the Fourteenth Amendment—Vagueness**

84. Plaintiffs reallege and incorporate by reference all of the allegations in paragraphs 1 through 78 as set forth herein.

85. The Due Process Clause of the Fourteenth Amendment prohibits laws that are unconstitutionally vague. A law is unconstitutionally vague when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited" or "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)). When a law "is capable of reaching expression sheltered by the First Amendment," the vagueness doctrine "demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974).

86. The Solicitation Ban is unconstitutionally vague as applied to Plaintiffs' intended member-to-member union PAC solicitations. It fails to provide fair notice about what speech it prohibits and, in particular, what Section 13 means when it prohibits "indirectly" soliciting union PAC contributions.

87. Without a well-defined standard of criminal and civil responsibility, the Attorney General and OCPF have nearly unfettered discretion to apply their own standards to identify indirect member-to-member union PAC solicitations proscribed by the Solicitation Ban. The Solicitation Ban therefore invites arbitrary and discriminatory enforcement.

88. Because the Solicitation Ban fails to provide fair notice to enable ordinary people to understand what constitutes a prohibited indirect member-to-member union PAC solicitation and invites arbitrary and discriminatory enforcement, the Ban as applied to such solicitations is unconstitutionally vague and violates the Fourteenth Amendment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

a. Issue a judicial declaration that the Solicitation Ban violates the First Amendment as applied to union PAC solicitations by MTA and BEU members from non-subordinate union members outside of working hours, without using public facilities or resources;

b. Issue a judicial declaration that the Solicitation Ban violates the Fourteenth Amendment as applied to union PAC solicitations by MTA and BEU members from non-subordinate union members outside of working hours, without using public facilities or resources;

c. Permanently enjoin Defendants from enforcing the Solicitation Ban against union PAC solicitations by MTA and BEU members from non-subordinate union members outside of working hours, without using public facilities or resources;

d. Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, under 42 U.S.C. § 1988; and

e. Grant other such relief as the Court deems just and proper.

Date: October 26, 2026

Respectfully submitted,

*/s/ Marissa Marandola*
Jason Walta (BBO No. 479522)
Marissa Marandola (BBO No. 705609)
Esther Ritchin*
National Education Association
1201 16th Street NW
Washington, DC 20036
(202) 822-7035
jwalta@nea.org
mmarandola@nea.org
eritchin@nea.org

*Attorneys for Plaintiffs*

Ryan Leach (BBO No. 706159)*
Massachusetts Teachers Association
2 Heritage Drive, 8th Floor
Quincy, MA 02178
(617) 878-8284
rleach@massteacher.org

*Attorney for Plaintiff Massachusetts Teachers Association*

*Application for admission *pro hac vice* forthcoming